[Civ. No. 15847. First Dist., Div. One. June 9, 1954.]

ELIZABETH FENTON PERSKE, Appellant, v. PEARL C. PERSKE, Respondent.

796

Thompson & Thompson for Appellant.

Gustave L. Goldstein for Respondent.

PETERS, P. J.—Elizabeth Perske, the plaintiff, is the second and present wife of defendant Dr. Frederick Perske, an osteopath. Pearl Perske, a defendant and the cross-complainant, is the first wife of the doctor. Elizabeth brought an action against her husband and Pearl to quiet her title to a lot in Pebble Beach. Pearl responded with a cross-complaint, charging that the property in question was the property of the doctor, and asked to have a conveyance from the doctor to Elizabeth set aside as in fraud of creditors, and the property made subject to a lien held by Pearl for alimony and child support. The trial court set aside the conveyance as fraudulent, found that Elizabeth and the doctor each owned a one-half interest in the lot, and subjected the one-half interest of the doctor to the lien of Pearl. Elizabeth appeals from those portions of the judgment. Her main contention is that the basic findings are not only unsupported, but contrary to the uncontradicted evidence.

Pearl secured a divorce from the doctor in July, 1945, in Los Angeles. The divorce decree ordered the doctor to pay $100 a month as alimony and $100 a month for six months for the support of the couple's two minor children, and thereafter to pay to Pearl an additional $50 a month for the support of the children. The doctor married Elizabeth Fenton, his present wife, and the plaintiff, in 1946. By a deed dated August 15, 1948, and recorded August 18, 1948, the doctor and Elizabeth became the record owners, as joint tenants, of a lot in Pebble Beach. The purchase price was $3,100. On August 22, 1949, the doctor, by grant deed recorded August 23, 1949, conveyed to Elizabeth his record interest in this lot. At this time the doctor was delinquent in his payments to Pearl in the amount of at least $625, and at the time of trial, in September, 1952, he owed Pearl $4,500.

In November of 1950 the doctor owed Pearl $1,950. She caused a writ of execution to be levied upon the Pebble Beach lot which could not be satisfied because the record title to the lot was then in Elizabeth. The writ, however, caused a cloud on the title. Elizabeth, in February, 1951, brought this action against her husband and Pearl to quiet her title to the lot, claiming sole ownership. Pearl filed a cross-complaint against the doctor and Elizabeth in support of her execution, alleging that because the property was in the name of Elizabeth her writ of execution could not be satisfied against the property, and averring that the deed from the doctor to Elizabeth was a fraudulent conveyance which should be set aside as void. Elizabeth answered the cross-complaint, alleging that the lot was purchased entirely from her separate funds; that at all times she intended the lot to be her separate property; that when the deed was put in joint tenancy she did not know the legal effect of such a deed and intended the lot to be her separate property; that in August of 1949 when she discovered that title to the lot was in the doctor's and her names as joint tenants, she requested the doctor to convey his interest to her in accordance with her original intention; that the doctor had no interest in the lot; and that in accordance with her request the doctor deeded the property to her.

The cause proceeded to trial on these issues. The trial court determined that the conveyance by the doctor to Elizabeth was fraudulent and should be set aside, that the doctor's interest in the property was subject to the lien of the levy of execution for $1,950 and was further subject to a total lien of $4,500 (which includes the $1,950) due to Pearl at the

time of trial. Elizabeth's title was quieted only as to a one-half undivided interest in the Pebble Beach lot. Elizabeth appeals from those portions of the judgment adverse to her.

The trial court found that the allegations of Elizabeth's answer to the cross-complaint that she had paid the entire purchase price of the lot with her separate funds, that nothing was paid by the doctor, and that it was always her intention to own the lot as her separate property, were untrue. The court also found that since August of 1948 the doctor has been the owner of an undivided one-half interest in the lot; that since the conveyance by the doctor to Elizabeth in August of 1949 Elizabeth has held and now holds the record title of the doctor's one-half interest in trust for him and subject to the lien of the execution; that Elizabeth paid no consideration for the deed from her husband; that the doctor was insolvent on August 22, 1949, when he conveyed his interest in the lot to Elizabeth and is now unable to satisfy the writ of execution; that the conveyance to Elizabeth was made with her knowledge and consent and with the intent to cheat, hinder, delay or defraud Pearl in the collection of support moneys.

The point need not be labored that, if the findings that Elizabeth did not pay for the property from her separate funds, and that the doctor had a one-half undivided interest in the property which he conveyed to Elizabeth at a time he was indebted to Pearl, are supported by the evidence, the conveyance of such interest was fraudulent and was properly set aside. (Civ. Code, §§ 3439-3439.12.) Elizabeth attacks the judgment on several grounds, but her basic contention is that the evidence shows, without conflict, that she purchased the lot with her separate funds, and that the doctor had no interest in the lot. She contends that the findings to the contrary are unsupported.

It is conceded that the findings that the doctor received no consideration for the conveyance of his interest to Elizabeth, and that at that time he was in default in his payments to Pearl, are supported. Of course, the introduction of the deed by which title to the lot was taken in the doctor's and Elizabeth's names as joint tenants established a prima facie case that the doctor then became a joint owner of the property. But Elizabeth urges that the uncontradicted testimony of herself and the doctor establishes that she paid for the property with her separate funds, and that she never intended to make a gift of any interest to the doctor. At any rate, she contends, he never acquired an interest in the lot. She

therefore contends that the prima facie case established by respondent was rebutted as a matter of law.

But three witnesses testified at the trial—Elizabeth, the doctor, and the sister of Elizabeth. The latter's testimony is only incidentally involved. There is no doubt that Elizabeth and the doctor testified that the property was purchased with Elizabeth's funds, that there was no intent to make a gift to the doctor, and that he never acquired an interest therein. If this testimony had been believed by the trial court it would have amply supported a judgment in favor of appellant. The question is, did it have to be believed? If so, the findings are unsupported. If not, the prima facie case established by respondent was not rebutted and supports the judgment.

Appellant produced a canceled cashier's check for $3,100 purchased by her, and which was used to pay for the lot. She produced a bank record indicating that a few days before the date of the deed she withdrew $3,100 from her account. She testified that this sum, so withdrawn, was used to purchase the cashier's check. She also testified that every cent of the money in this account was her separate property. Many of the substantial deposits in that account were made after appellant's marriage to the doctor. Thus, she testified that $2,000 in four $500 payments was derived from the repayment of a loan made by her to her brother-in-law, $1,127.50 was received from cashed-in defense bonds, $667 and $400 were received upon the sale of her privately-owned Chevrolet automobile, $131.75 and $600 were received upon the sale of antiques, and $300 upon the sale of her fur coat. Both Elizabeth and the doctor testified that not one cent of the doctor's money went into the purchase price of the lot. The sister of appellant testified that her husband had borrowed $2,000 from appellant, and repaid it in four $500 payments.

To rebut the inference created by the joint tenancy deed that she intended a gift to her husband, appellant testified that when the property was purchased she had an understanding with her husband that since she had paid for the property it was "always to be my property," and that she did not understand the legal significance of a joint tenancy deed, but took title in that fashion because that was the way her parents held their property. Of course, in a proper case, the inference of a gift created by the joint tenancy deed may be rebutted by evidence of an intent not to make a gift.

800

(*Huber* v. *Huber,* 27 Cal.2d 784 [167 P.2d 708]; *Gudelj* v. *Gudelj,* 41 Cal.2d 202 [259 P.2d 656].) If the inference was here rebutted the doctor had merely a record title. ▪ His conveyance of such title to the true owner would not be a fraudulent conveyance. (*Kinnison* v. *Guaranty Liquidating Corp.,* 18 Cal.2d 256 [115 P.2d 450].) At most, under such a state of facts, the doctor would be a constructive trustee for his wife of his joint tenancy interest, and the conveyance of such interest to her would not be fraudulent. (*Estate of Harris,* 9 Cal.2d 649 [72 P.2d 873].) It is further asserted that this conclusion is supported by the presumption that in making the conveyance to his wife the doctor was acting honestly, which presumption respondent, it is claimed, did not rebut by evidence of convincing force as required by the law.

Appellant next makes an argument directly inconsistent with the one first made. She urges that if the doctor did acquire a joint tenancy interest by the August, 1948, deed, the evidence shows that his 1949 conveyance to her was in discharge of an obligation owed to her. Such a conveyance would not be fraudulent. (*Greenwalt* v. *Mueller,* 126 Cal. 636 [59 P. 137]; *Dandini* v. *Dandini,* 82 Cal.App.2d 263 [186 P.2d 41]; Civ. Code, § 3439.03.) This contention is based on appellant's evidence that originally the property was to be taken in her name alone, but at the last minute she changed it to joint tenancy with the understanding that the doctor, when able, would repay to her his half of the purchase price, or $1,550. When the doctor was unable to repay this sum he deeded the property to her. The doctor corroborated this testimony.

▪ It will be noted that appellant told two inconsistent stories. Her answer to the cross-complaint pleaded, and she offered testimony in support of the pleading, that she paid for the lot with her own money, took the deed in joint tenancy in ignorance of its legal effect, that she intended always that the lot should be her property, and that when she discovered title was in their joint names she requested the conveyance of the doctor's interest to her in accordance with her intention at the time of purchase. But at the trial, for the first time, appellant and the doctor testified that the deed was intentionally taken in joint tenancy subject to an agreement on the part of the doctor to pay her $1,550 when able, that, when the doctor became convinced he could not pay this sum to her, he conveyed his interest to her in satisfaction

of this obligation. Respondent urges that these inconsistencies were properly considered by the trial court in passing on the credibility of appellant and her husband, obviously interested witnesses.

There was other evidence that undoubtedly was considered in passing on the credibility of these two witnesses. Appellant, in accounting for the purchase of a Cadillac automobile, registered in appellant's name and purchased after her marriage to the doctor, testified that the doctor partly paid for the car by turning in his privately-owned automobile, and that she paid in cash the balance of $900. The doctor corroborated this story. There was no evidence of a withdrawal of $900 from appellant's bank account at or about the time of this transaction. Appellant testified, however, that she got the money from a safe in her parent's home where she kept large sums, up to $3,000, in currency, in an envelope. These sums were so kept although appellant possessed several bank accounts in and from which she made frequent deposits and withdrawals. She kept this money in this fashion, she testified, for the purposes of paying for future travel, education, and the buying of antiques. Although the doctor corroborated this story at this trial, he had testified in Los Angeles in a contempt proceeding about the purchase of this Cadillac, and had not then disclosed that the $900 had come from his wife's funds.

There were other factors that the trial court could consider in weighing the testimony produced by appellant. She testified about the purchase of the cashier's check and was clear and positive in her testimony about the withdrawal of $3,100 from her account to make this purchase. But when cross-examined about other large deposits or withdrawals made in the same year she was quite vague and uncertain.

Appellant urges that, under this evidence, the trial court was bound by the doctor's and her testimony, inasmuch as such testimony was uncontradicted, and was without power to disregard it. ■ Of course, a trial court cannot arbitrarily disregard uncontradicted testimony. ■ But where, as here, the trial court (by its finding that the property was not purchased entirely with appellant's funds) has necessarily found that the so-called uncontradicted evidence was false, an appellate court will not interfere if there is any basis at all to support the trial court. As was said in *La Jolla Casa deManana* v. *Hopkins*, 98 Cal.App.2d 339, at page 345

[219 P.2d 871] : "An appellate court cannot control a finding or conclusion denying credence, unless it appears that there are no matters or circumstances which at all impair the accuracy of the testimony, and a trial judge has an inherent right to disregard the testimony of any witness, or the effect of any prima facie showing based thereon, when he is satisfied that the witness is not telling the truth or his testimony is inherently improbable due to its inaccuracy, due to uncertainty, lapse of time, or interest or bias of the witness. All of these things may be properly considered in determining the weight to be given the testimony of a witness although there be no adverse testimony adduced. The trial judge is the arbiter of the credibility of the witnesses. A witness may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions or of his own conduct as to discredit his whole story. His manner of testifying may give rise to doubts of his sincerity and create the impression that he is giving a wrong coloring to material facts. [Citing cases.]" This rule is well settled, is supported by many authorities, and is applicable to this case.

In the instant case the trial judge saw and heard appellant and the doctor testify. He knew of the inconsistencies in their testimony, and of their self-interest. He determined that their testimony was fabricated and not to be believed. He found contrary to their testimony. We cannot disturb his findings.

Appellant, to succeed on this appeal, had to establish either that she intended at all times to keep ownership of the lot, or that there was a mutual agreement between the doctor and herself that the doctor was her debtor to the extent of a half interest. The two theories are inconsistent. But appellant attempted to establish both theories. This, standing alone, casts doubt upon her testimony. This inconsistency the trial court was entitled to consider in weighing her testimony.

The portion of the judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.